| DISTRICT COURT, <br> CITY AND COUNTY OF DENVER, STATE OF COLORADO <br> 1437 Bannock Street, Room 256, Denver, CO 80202.   720-865-8301. | DATE FILED: May 20, 2021 1:13 PM <br> FILING ID: 536A078B303E4 <br> CASE NUMBER: 2021CV31594 <br><br> σ COURT USE ONLY σ |
|---|---|
| Plaintiff(s):   Titus Peterson and Diego Quintos de Peterson <br><br> v. <br><br> Defendant(s):     City and County of Denver and the Denver Police Department | Case Number: |
| Attorney for the Plaintiffs <br><br> Titus Peterson,            A.R.N. #19926 <br> 600 17th St., Suite 2800, Denver CO  80202 <br> 303-260-6412   email:  Titusdp@msn.com | DIV: |
| COMPLAINT ||

Comes now, the Plaintiffs, Titus Peterson, and Diego Quintos de Peterson, and do state and allege as follows:

## INTRODUCTION

1. On the 30th day of May 2020, a Black Lives Matter demonstration was occurring in the City and County of Denver to protest police brutality.

2. The Plaintiff Titus Peterson was taking his sons A. age 12 and Diego Quintos de Peterson age 18 to the protest and demonstration.

3. The protest was taking place roughly between the State Capitol and in front of the City and County Building in Downtown Denver.

4. As the Plaintiff Titus Peterson drove into downtown Denver all the streets leading to downtown Denver were closed. These streets included, but were not limited, to 13th 14th, Colfax, 16th, 17th, 18th and 19th avenues, Broadway, Lincoln, Bannock and Sherman and Grant Streets. The streets were closed by vehicles clearly marked and identifiable as Denver Police vehicles and police officers from the Denver Police Department.

5. The Police Vehicles were clearly marked as the Denver Police Department Vehicles and their overhead siren lights were on and numerous police officers stood by these vehicles redirecting traffic.

6. The Plaintiff Titus Peterson eventually found a place to park which was not cordoned off by the Denver Police. He and his children began walking toward the State Capital on Colfax avenue. As he walked along Colfax avenue, he was heading West on the city sidewalk on the North side of the street with his two sons.

7. Upon approaching the State Capital, the Plaintiffs did not see any violence or vandalism by any of the demonstrators at the Black Lives Matter rally. Instead, he noted that many of the protesters had dispersed into a semi-circle including the State Capitol grounds and civic center park. These protesters were yelling at the Black S.W.A.T. Police Humvee vehicle and the uniformed men around it who were dressed

in all black. These men and the Denver Police Officers watching them all were covering their faces with tear gas protective equipment.

8. Upon reaching the state Capital, approximately at Lincoln and Colfax, while walking on the North Side of Colfax on the sidewalk the Plaintiffs also could see a black Humvee Military Style vehicle parked at the intersection of Colfax Ave. and Broadway in Denver. The S.W.A.T. team, all dressed in black, surrounded the Humvee. Both the Humvee and the S.W.A.T. team were surrounded by Denver Police Vehicles and Denver Police Officers.

9. Upon reaching the State Capital, approximately at Lincoln and Colfax, while walking on the North Side of Colfax on the sidewalk the Plaintiffs could hear people in the crowd of protesters yelling at the S.W.A.T. team members and the Denver Police Department to remove their gas masks.

10. Within a few seconds of hearing these calls to remove gas masks the S.W.A.T. team began firing tear gas cannisters at the protesters who were gathered in front of the State Capital in civic center park and who had spilled out onto the Colfax Avenue.

11. As the tear gas swept over the crowd the Plaintiffs who were still on the sidewalk were caught in the cloud of tear gas, their eyes began burning, they could not breath, began coughing heavily and they were forced to leave the demonstration.

12. As the Plaintiff's left the demonstration other demonstrators were laying prone on the ground, howling in pain from the tear gas, pouring water and milk in each other's

eyes, coughing and gagging.  Some of the protesters indicated that they had been shot with rubber bullets and indicated to the Plaintiff's that they should take cover before they, too, were shot.

13. On May 31st, 2020 Plaintiff Titus Peterson gave a Governmental Immunity Notice to the City and County of Denver notifying the City and County that he intended to sue the City and its police force for violating his and his children's First Amendment Rights by unleashing the Denver Police Department on them and other protesters.

14. Within several weeks of filing this Government Immunity Notice with the Denver City Attorney's office Plaintiff Titus Peterson was contacted by Sgt. Dixon with Denver Police Department's internal investigations.

15. Sgt. Dixon indicated that he was doing an internal investigation for the Denver Police Department about what had occurred.   Sgt. Dixon questioned Plaintiff Titus Peterson about how Mr. Peterson could be sure that it was the Denver Police Department that had shot rubber bullets and released tear gas upon the crowd of protesters.

16. Plaintiff Titus Peterson recounted the sum and substance of facts that are outlined in paragraphs above.   Sgt. Dixon asked Plaintiff Peterson if he saw the Denver Police Department logo on the Black Humvee or on any of the uniforms of the men dressed in black who released the tear gas or fired the rubber bullets.  Mr. Peterson said he did not remember seeing any actual indications that this was the Denver Police Department but indicated that Denver Police Department was surely complicit in

what had happened as they put on gas masks and were protecting the officers dressed in Black and the Humvee from which the tear gas was being dispersed.

17. Upon completing his interview of Plaintiff Titus Peterson, Sgt. Dixon indicated that it was not the Denver Police who were involved and there was not enough evidence to suggest that the Denver Police had anything to do with the gassing of Mr. Peterson and his children or the firing of rubber bullets at the crowd of protesters. Instead, Sgt. Dixon indicated that it was some outside law enforcement agency. Mr. Peterson responded that the Denver Police clearly had allowed and facilitated this organization being present and preventing the use of the sidewalks and streets of Denver and otherwise creating the dangerous condition.

18. As a result of the actions of the Defendants the Defendants interfered with the Plaintiffs use of the sidewalks and streets to participate in the Black Lives Matter protest the Plaintiffs were gassed and had highly unpleasant mental reactions:  they were in shock, anxiety, fright, horror, grief, humiliation, embarrassment, anger, chagrin, disappointment, and worry.

COUNT 1
(Premise Liability DANGEROUS CONDITION)

19. The Plaintiffs incorporate all other paragraphs as if more fully spelled out herein.

20. The Plaintiffs were licensees or invitees on the Denver City Sidewalks.

21. In Colorado pursuant to 24-10-106. Immunity and partial waiver

22. Sovereign immunity is waived by a public entity in an action for injuries resulting from:

    (d)
    (I) A dangerous condition (which physically interferes with traffic) on any road, street, or sidewalk which was designed and intended for public travel…

23. The Defendants created a dangerous condition that caused an offensive and harmful physical contact with the Plaintiffs preventing the Plaintiff's from exercising their free speech rights and right to associate with others.

24. The Defendants were motivated to create this dangerous condition since they generally didn't like the fact that the Plaintiffs were participating in a protest against police brutality.

25. The Plaintiffs were using a public sidewalk at the time the dangerous condition was being created by the Defendants.

26. The Defendants created a dangerous condition on a municipal sidewalk, street and park by actually assaulting and battering the Plaintiffs or were complicit therein.

27. The Defendants placed or actually participated in placing unidentified police units or unrelated SWAT teams in a position where they could fire rubber bullets and release tear gas upon the Plaintiffs placing them in apprehension of immediate physical contact and then actually causing the Plaintiffs physical pain.

28. As a result of the Defendants' actions the Plaintiffs were placed in apprehension that further physical contact would occur if they did not abandon their message that police brutality had to stop.

29. As a result of dangerous condition that was created by the Defendants the Plaintiffs were assaulted and battered and otherwise injured and this interfered with the

Plaintiffs' abilities to travel on the sidewalk and streets and parks of Denver near the capital.

## COUNT 2
(Intentional Infliction of Emotional Distress)

30. The Plaintiffs incorporate all other paragraphs as if more fully spelled out herein.

31. The Defendants assaulted and battered the Plaintiffs.

32. The Defendants fired rubber bullets into the crowd where the Plaintiffs were walking and then gassed the Plaintiffs with tear gas.

33. The Defendants were motivated by and animus that included, but was not limited to, that they generally did not like the fact that the Plaintiffs were protesting police brutality.

34. The Defendants intended to inflict severe emotional distress upon the Plaintiffs due to the fact that they were motived by a desire to prevent the Plaintiffs from exercising their free speech rights and right to associate with others regarding state sponsored brutality.

35. As a result of the Defendants' actions the Plaintiffs were placed in apprehension that further physical contact would occur if they did not abandon their message that police brutality had to stop.

36. The Defendants then hurt the Plaintiffs.

37. The Plaintiffs were placed in severe emotional distress.

38. As a result of the intentional acts of the Defendants, the Plaintiffs were injured, both physically and psychologically.

## COUNTS 3 and 4
### (Assault and Battery)

39. The Plaintiffs incorporate all other paragraphs as if more fully spelled out herein.

40. The Plaintiffs were licensees or invitees on the Denver City Sidewalks.

41. The Defendants assaulted and battered the Plaintiffs.

42. The Defendants did this by threatening and then causing an offensive and harmful physical contact with the Plaintiffs.

43. The Defendants fired rubber bullets into the crowd where the Plaintiffs were walking and then gassed the Plaintiffs with tear gas.

44. The Defendants were motivated by and animus that included, but was not limited to, that they generally did not like the fact that the Plaintiffs were protesting police brutality.

45. The Defendants were further motived by a desire to prevent the Plaintiffs from exercising their free speech rights and right to associate with others.

46. As a result of the Defendants' actions the Plaintiffs were placed in apprehension that further physical contact would occur if they did not abandon their message that police brutality had to stop and then they were hurt.

47. As a result of the intentional acts of the Defendants, the Plaintiffs were injured, both physically and psychologically.

## COUNT 5 and 6
### (Outrageous Conduct and Deprivation of Rights)

48. The Plaintiffs incorporate all other paragraphs as if more fully spelled out herein.

49. The Plaintiffs have Constitutional Rights protected by the United States and Colorado Constitutions. These rights, include but are not limited to, the right to free speech and freedom of assembly.

50. The Defendants engaged in extreme and outrageous conduct.

51. The Defendants did so intending to cause the Plaintiffs to abandon their Constitutional Rights.

52. The Defendant's inflicted severe emotional distress in order to prevent the Plaintiffs from exercising their Constitutional rights.

53. The Defendants assaulted and battered the Plaintiffs.

54. The Defendants threatened and then caused an offensive and harmful physical contact with the Plaintiffs.

55. The Defendants fired rubber bullets into the crowd where the Plaintiffs were walking and then gassed the Plaintiffs with tear gas.

56. The Defendants were motivated by and animus that included, but was not limited to, that they generally did not like the fact that the Plaintiffs were protesting police brutality and calling for reform of the laws.

57. The Defendants were further motived by a desire to prevent the Plaintiffs from exercising their free speech rights and right to associate with others regarding the need to address state sponsored brutality and cruelty.

58. The Defendants' actions shock the conscience of a civilized society and are generally unacceptable,

59. As a result of the Defendants' actions the Plaintiffs suffered a highly unpleasant mental reaction.  The Plaintiffs were placed in fear, shock, horror, anger, humiliation, fright, disappointment, and worry.   They were, moreover, apprehensive that further physical contact or harassment would occur if they did not abandon their message that police brutality had to stop.

60. The Defendants then hurt the Plaintiffs.

61. As a result of the intentional acts of the Defendants, the Plaintiffs were injured, both physically and psychologically.

### PRAYER FOR RELIEF

62. The Plaintiffs seek damages for their physical and emotional pain and suffering, deprivation of Constitutional Rights, statutory interest from the date of the incident and any and all other damages and or attorney fees provided by statute or common law.

Filed this the 20th day of May 2021.

s/ *Titus Peterson*                                                      .

Exhibit A